C. L. Stodalka v. Commissioner.
Stodalka v. Commissioner
Docket No. 110478.
United States Tax Court
1943 Tax Ct. Memo LEXIS 498; 1 T.C.M. (CCH) 458; T.C.M. (RIA) 43037; January 22, 1943
*498 Edgar S. Young, Esq., First Nat'l Bank Bldg., Little Falls, Minn., for the petitioner. Edward C. Adams, Esq., for the respondent. OPPER
Memorandum Findings of Fact and Opinion OPPER, Judge: Petitioner in this proceeding challenges respondent's determination of income tax deficiency in the amount of $584.63 for the year 1940. The single question is whether stock held by petitioner became worthless in the year 1940. Petitioner does not dispute additions to his taxable income of $547.33 determined in the deficiency notice. Findings of Fact Petitioner, an individual, resides in Little Falls, Minnesota, and filed an income tax return for the year 1940 with the collector of internal revenue for the district of Minnesota. In that return petitioner took a long-term capital loss deduction of $4,500 which respondent disallowed. In 1935 petitioner acquired the stock involved in that deduction, which consisted of 15,000 shares of capital stock of the St. Cloud Brewing Company, hereinafter referred to as the company, for which petitioner paid $9,000. The company had been incorporated on March 16, 1933, under the laws of the State of Minnesota. The plant was located in St. Cloud, Minnesota, *499 and J. H. Nicolin was the manager and brewer. The company made profits in the years 1934, 1935, and 1936, but incurred losses in 1937 and 1938 as the result of a change in the company's manufacturing methods in 1936. J. H. Nicolin died in December, 1936, and in 1937 the company was managed by his son. After J. H. Nicolin's death the company had inefficient management, made poor beer, and its sales dropped off. On January 3, 1938, the District Court of Stearns County, Minnesota, appointed a temporary receiver for the company. It experienced internal trouble and on June 1, 1938, John P. J. Dolan was appointed permanent receiver. The company's creditors filed a petition for reorganization under section 77B of the National Bankruptcy Act, and on October 3, 1938, the District Court of the United States, District of Minnesota, approved the petition and appointed John P. J. Dolan temporary trustee. On December 8, 1938, the court appointed Robert V. Gleason, who qualified on December 10, 1938, as permanent trustee, and ordered a proposed plan of reorganization to be submitted within six months from that date if feasible. A financial statement as of December 10, 1938, based on the company *500 records, submitted to the court by the trustee on February 14, 1939, showed total assets of $207,862.25, total liabilities $65,378.64 and net worth of $142,483.61. The plant and equipment, most of which were subject to first and second mortgages totaling $18,000 in favor of the Federal Reserve Bank of Minneapolis and Charles H. Preston, were carried on the company books at $195,187.90. The company ceased manufacturing beer about October, 1938, but at the time the permanent trustee took charge of the property there was a stock of poor beer on hand which was put into saleable condition. By the middle of 1939 all of that stock had been sold or disposed of. After issuance of an order to show cause on June 8, 1939, by the court, the Federal Reserve Bank of Minneapolis petitioned for an order permitting it to foreclose its mortgage, but upon a showing by the trustee of a prospect that additional time would result in a reorganization plan the court granted the trustee an extension until September 8, 1939, to propose a plan. No plan of reorganization was submitted by September 8, 1939, and on October 4, 1939, the court ordered that the petition of the Federal Reserve Bank to foreclose be *501 granted subject to a one-year period of redemption from date of sale. On November 28, 1939, the trustee filed his report and account with the court. That report and account stated: That in connection with the work on such proposed plan, your trustee has taken the position that the assets in said estate were worth more than the liabilities therein. That in a general way, the debtor had approximately $60,000.00 of liabilities and assets which your trustee conservatively valued at the time at over $100,000.00 for the purposes of the proposed plan. That your trustee was of the opinion that the mortgages should be paid and that the reorganized company should have approximately $20,000.00 in working capital. That your trustee thought a plan could be worked out whereby $30,000.00 could be raised by placing a new loan on the physical assets of the debtor and an additional amount could be raised by selling stock in a new corporation to be organized for the purposes of reorganizing the debtor company. That your trustee was given further time in which to reorganize the debtor from time to time and has authority to submit a plan of reorganization up until the time an order is made herein *502 either adjudging the above named debtor a bankrupt or dismissing the petition herein. That it is still possible that a plan of reorganization will be submitted within the time herein mentioned and that your trustee is still attempting to effect such a reorganization. * * * * *
That at the present time he is dealing with Pat McLain of St. Paul and Mr. John T. Mahoney, Mr. Mahoney being the contact man endeavoring to interest Mr. McLain is refinancing the brewery operation, and in this connection has submitted to Mr. McLain all of the facts and has arranged to have him examine and investigate the condition of the brewery. The trustee requested a continuance of the time within which he might submit a plan, up to and including the date of the final order, either dismissing the petition or adjudicating the company bankrupt. Whereupon, the court ordered on December 1, 1939, that cause be shown on January 13, 1940, why the petition should not be dismissed or the company be adjudicated bankrupt provided a reorganization plan was not submitted prior to the final order in the proceedings. The Federal Reserve Bank foreclosed its mortgage on the company's buildings and equipment on January *503 20, 1940. On March 7, 1940, the court adjudged the company bankrupt and referred the matter to a referee in bankruptcy and subsequently R. H. de Lambert was appointed trustee in bankruptcy. Upon order of the referee dated November 28, 1940, the trustee's report and account was submitted with a letter dated December 2, 1940. The report and account stated in part: * * * your trustee can at this time see no possibility of a sale being made prior to January 20, 1941, and hence believes that title to all of the assets of said estate will be lost by reason of said foreclosure sale and running of the time to redeem therefrom, * * * The letter stated in part: Frankly, we are very doubtful whether any sale of the trustee's equity in these assets can be made before the time to redeem from the bank's foreclosure expires. The bank's mortgage covers all of the assets, both real and personal, and in the event no sale is made before the time to redeem expires, there will be no assets in this estate except a few dollars, probably not sufficient to pay direct outlays of the bankruptcy proceedings. In 1938 and 1939 the assets of the company as a going concern had a potential value in excess of *504 the outstanding liabilities which amounted to about $65,000, including mortgages. During the same period the collective liquidating value of the assets, if marketed separately, was in excess of the $18,000 of mortgages outstanding against them. Upon foreclosure, the mortgagee sold the assets for approximately $10,000 and the purchaser resold the assets for approximately $25,000. Throughout 1938 and 1939 the respective trustees attempted to reorganize the company by securing new capital and management. Several parties became interested in the properties but final agreements were not concluded by January 20, 1940, the date of the foreclosure. After that date there was no possibility of reorganization. During 1938 and 1939 there was no market for the company's stock which, however, had a potential value due to the definite possibility of reorganization throughout that period and up until January 20, 1940. The stock in question became worthless during 1940. Opinion The evidence as to the year of loss in this proceeding is more consistent than is usual in stock loss cases. The difficulty generally is to select from a series of events in the gradual deterioration of a corporation that *505 which may in the language of , affirmed (C.C.A., 7th Cir.), , be chosen as the one identifiable event putting an end to the "reasonable hope and expectation that it [the stock] will become valuable at some future time." Usually, there are not only many such events, but they are spread over numerous years. It is most unusual that the critical occurrences should point to a given year with such unanimity as in the present situation. It also happens that while the year thus indicated is that selected by petitioner, it is respondent's witnesses who by their testimony most clearly ratify that choice. One of these was of the opinion that - * * * the value of the stock in 1938, right at the moment it had no particular value at all, but it had a potential value, because the stockholders held this stock and if the company could be reorganized the stockholders would have an interest in the reorganization, and to that extent it had a value * * * It made no beer, manufactured nothing, and the company in 1939, we were attempting during that entire year to interest people in St. Cloud and *506 interest other people in putting money into the Company and did not succeed, so that in March, 1939 [1940] [1], Judge Sullivan, who had set a date within which we must file a plan of reorganization, threw the company into bankruptcy, put it into bankruptcy court, and that was the end of it * * * at that time in 1940 the situation was just as I have already given it, except that we had reached the end of our funds and we had definitely determined that we could not reorganize, and the Court then threw it into bankruptcy. He was asked - Q. Now, is there any difference in your opinion as to the value of that stock on March 7th, 1940 and on December 25, 1939, let us say? A. Well, I would say there was, because then it had no potential value at all. In 1939 it did, simply because it could have been reorganized in 1939 * * * and for that reason I always considered that the stock had some potential value, although it was slightly sloughed off. To summarize, the position of the witness was stated as follows: Q. As I understand it, during 1938 you did have some production at the brewery?
*507 A. Yes. Q. It was your opinion that as a going concern the stock had a potential value in 1938? A. I think it did have. Q. And as I understand it, it was your opinion that the same situation existed through 1939 and up to the time of the bankruptcy in 1940, is that right? A. Up until - yes, up until the time that the bank foreclosed its mortgage * * * Now on recalling it I do recall that with that foreclosure it made it absolutely impossible to even think about reorganization * * *. Q. But you think whatever the date was it was the foreclosure that terminated the possibility of reorganization? A. I think so. * * * Up until the date of foreclosure there was, I think, a fair possibility. After foreclosure it was very remote, and in my opinion when the bankruptcy came it was absolutely out of the question. On cross-examination he testified as to asset value: Well, I always figured it was very much in excess of the mortgage at least, that was against it, and in excess of the claims that were allowed. I think that our appraisal ran from $150,000 to $200,000. Another witness for respondent, who ultimately became the trustee in bankruptcy, testified: I made attempts to make a *508 sale of the property so that we could collect for the equity over and above the mortgage, but no attempts at reorganization after March 7th, 1940. That witness thought that the property "was worth at least $30,000, including the mortgage money, I mean, of course." Q. In other words, there was an equity of $12,000 or thereabouts? A. Yes, I tried to sell it for $30,000 or better * * *. Q. Do you think that the property was worth $30,000 as idle brewery property or as a going concern? A. As idle brewery property. And the former witness amplified this opinion by the statement: * * * it was my opinion that, at that time, and still is, that the assets of the company greatly exceeded the liabilities, if they could be sold properly, marketed, properly. * * * * *
* * * there is just one item there that I can't get out of my mind, and that is the beer bottling equipment there. That was worth $30,000 or $35,000 * * *. They had cooperage there that under proper marketing would be worth around $10,000 or $15,000 at that time. The report of the trustee in bankruptcy, which is entitled to weight in cases of this kind, see , *509 noted in November, 1940, that "your trustee can at this time see no possibility of a sale being made prior to January 20, 1941, and hence believes that title to all of the assets of said estate will be lost by reason of said foreclosure sale and running of the time to redeem therefrom." And the order of the District Judge terminating the reorganization proceedings under Chapter X, previously section 77B, of the National Bankruptcy Act and placing the company in bankruptcy on March 7, 1940, implies that his opinion was similar. As the language of those provisions demonstrates, the purpose in filing a petition in a proceeding of that nature is the petitioners' "desire * * * that a plan [of reorganization] be effected." The judge is authorized to direct that bankruptcy be proceeded with "if no plan is proposed within the time fixed or extended by the judge." It is not difficult to infer that the bankruptcy order was evidence of the judge's opinion that no further extension of the time to produce a plan was warranted. We thus have a situation where a previously successful corporation, meeting financial difficulties but possessed of valuable assets and desiring to reorganize, finds itself *510 confronted within the same year with a foreclosure sale of its properties for less than the amount of the mortgage, an order terminating the reorganization proceedings and directing liquidation, and the discontinuance of efforts on the part of those interested to effect a reorganization. It seems to us inescapable that that year is the one in which the definite worthlessness of the company's stock was established. It follows that the deduction claimed by petitioner should have been allowed. Decision will be entered under Rule 50. Footnotes
1. This appears from later testimony and from the documentary evidence to be a slip of the tongue.↩